DUFRESNE, Judge.
This is an appeal by plaintiff-appellant, Lafayette Insurance Co. (as subrogee on a fire policy) from a judgment dismissing its claims against three contractors whose asserted negligence caused a fire at its insured’s daiquiri outlet. Because we find neither manifest error in the factual findings of the trial judge, nor any error of law underlying his legal conclusions, we affirm that judgment.
The general facts of this case are not disputed. In the spring of 1989, Charles Schaefer, Lafayette’s insured, opened a drive-through daiquiri outlet. Prior to opening, a back bar and cabinet on which the daiquiri machines were to sit, was built by four different people, each of whom was an independent contractor:
1. Richard Laborde, a carpenter, who framed and trimmed out the bar;
2. Thomas Woods, d/b/a Woods Electrical Service, Inc., who installed the electrical wiring;
3. Ronald Schwehm, d/b/a Ronnie’s Laminated Plastics, who installed the formica bar top; and
*1347 4. An unnamed non-party plumber who ran the water and drain lines.
All of the above work was completed around March of 1989, and the construction was used without incident for a year and a half.
Then, on September 24, 1990, a fire broke out in the cabinet underneath the back bar, causing extensive damage to the premises and equipment. Lafayette paid Schaefer some $46,500.00 for the damage and sued Laborde, Woods and Sehwehm to recover this amount. Lafayette’s factual theory of the case was that the insulation on an electric wire was nicked by a nail or staple during construction and that the insulation eventually failed at that point, causing an arc. The resulting sparks fell upon some paper products stored in the cabinet and the fire ensued.
After a bench trial, the trial judge found that more probably than not the fire was caused by electrical arcing. He further determined, however, that the plaintiff had failed to show any act of negligence on the part of any of the three defendants which may have led to the fire. He therefore ruled in favor of each of the defendants and dismissed the suit. Each party was cast for his own costs. Lafayette has now appealed the main judgment, and Woods has answered the appeal challenging the allocation of costs.
Lafayette’s major assignment of error is based on its factual theory of the case which, in more detail, is as follows:
1. The fire began when sparks from arcing in an electrical wire fell on some paper products stored in the back-bar cabinet;
2. This arcing occurred because the insulation on the wire failed;
3. The insulation failed because it had been nicked by a nail or staple during construction of the back-bar a year and one-half before the fire;
4. This damage to the insulation had to have been the result of negligence on the part of:
a.) The carpenter, Laborde, in driving a nail through a wire; or
b.) The bar-top installer, Sehwehm, in setting a staple through a wire; or
c.) The electrician, Woods, in pulling the wire over the exposed point of a nail or staple when running it.
Lafayette argues here that the trial judge erred in failing to resolve, in his reasons for judgment, conflicts in the testimony of the various defendants so as to establish which of the three was liable. Alternatively, it urges that if it is indeed impossible to determine from the evidence which defendant more probably than not damaged the insulation, then the following rule should apply. The plaintiff should receive the benefit of this uncertainty by having all three defendants cast in judgment in its favor, in solido, and imposing on these latter parties the burden of sorting out their respective responsibilities to the plaintiff among themselves.
As to Lafayette’s first argument, a more particularized summary of the evidence is required. Laborde, the carpenter, as well as his assistant Deri Havard, testified that in building the back bar they first made a frame of 2x4s about three feet high, 80 inches wide and perhaps 15 feet long. To support the top, 2x4 cross-braces were placed about 20 inches apart between the back wall and the long 2x4 which constituted the front top edge of the bar. Both men stated that upon completion of the frame, they immediately covered it with ½ inch thick CDX rough plywood which they attached to the cross-braces with 3 inch nails. Both also said that no wires or plumbing had yet been installed when the rough plywood was nailed down and that laying this first layer of plywood was the last thing they did on the top of the bar.
Sehwehm, the counter-top installer, was uncertain as to exactly what he did on the bar top, other than gluing down the formica. He acknowledged that a sheet of % inch smooth plywood, necessary for properly laying the formica, had been attached to La-borde’s ½ inch rough plywood by use of a staple gun and 1 and ½ to 2 inch staples. He did not believe, however, that he had laid this second layer of smooth plywood because 1) *1348 had he done so, he would probably have attached it with screws and glue, rather than staples, and 2) the only staple gun that he owned could not drive staples as long as those actually used. He stated that he had no idea as to whether the wires had been installed when he laid the formica.
Woods, the electrician, testified that when he “roughed in” the wiring, there was no plywood at all on the top of the 2x4 frame. The owner, Charles Schaefer, similarly testified. Woods further explained that this “roughing in” involved drilling holes through the 2x4 cross-braces which ran from the back wall to the top front edge of the bar. The wires were then simply threaded through the appropriate holes, after which an electrical inspector had to approve the work before the area could be closed in. After closing, Woods said that he returned to the job to install switches and outlets as required by the owner. He finally noted that had a nail or staple been driven through the insulation of any of the roughed in wires, it would have tripped the breaker switch on that circuit when the power was turned on at the end of the job. Had that happened, he said that he would then have re-checked all of the wires until he found the problem.
Two experts testified for Lafayette. The first, Randall Bruff, was recognized as an expert on the origins and causes of fires. He stated basically that his examination of the fire scene showed that the fire originated in the wires running through the holes drilled through the cross-braces supporting the back-bar top. The second, George Hero, was also recognized as an expert in the origin and causes of fires, and additionally as an electrical engineer. Hero was also of the opinion that damaged insulation on the wires and consequent arcing and sparks was the most reasonable explanation for the fire. He was led to this conclusion by the fact that there was no other source of heat in the cabinet other than the wires. He admitted on cross-examination that had the paper products beneath the wires been set on fire by a cigarette butt or match, the resulting damage would probably have been the same. He ruled out these latter causes, however, because it was his understanding that none of the employees smoked and that the fire broke out when no one was in the shop. He also said he did not see any other evidence of arson, such as multiple points of origin.
On the question of how the insulation may have been damaged, Bruff and Hero were both in the realm of speculation. Hero noted that had a nail or staple actually been driven into a wire it would have been burned in the arcing and this burn mark would have been readily identifiable. He further admitted that both he and Bruff searched for such a nail or staple in the debris but could not find it. Hero suggested alternatively that the wire might have been pulled over a nail or staple point, thus damaging the insulation, but not resulting in the nail or staple actually being imphcated at the point of arcing.
Hero’s most concise statement as to the origin of the fire was:
Based on my evaluation, I saw no other origin or course of ignition for that fire other than the electrical origin. I have arcing in the conductors. I think that probably the wiring was damaged at some time during installation and was probably nicked by a staple or a nail and that in the course of time, there resulted an arc and that arc spewed a little material and ignited flammables in the cabinets and then we had a fire.
Lafayette asserts here that because the trial judge found as a matter of fact that the fire was electrical in origin, he necessarily had to find at least one of the defendants Hable for negligently nicking the wire. It further asserts that the judge erred in not making credibiHty determinations which would also necessarily have imphcated one of the defendants. We disagree with both propositions.
First, it does not necessarily follow that because the fire was electrical in origin, that any of the three defendants damaged the insulation. As the trial judge noted, yet a fourth contractor, a plumber, did work under *1349 the bar after the wires were installed. We also note that the wire may just as well have been defective when manufactured.
Second, there are permissible and consistent views of the evidence which would readily exculpate each of the named defendants. If Woods is correct that no plywood was laid when he put in the wires, then he is exonerated because no nails or staples were then present on which he could have damaged the wires. If it is next assumed that Laborde put down the rough ⅜ inch plywood with three inch nails, this alone would not show that more probably than not one of the nails pierced a wire. Moreover, had this been the ease, Woods testified that this would most probably have tripped the circuit breaker when the power was originally turned on. In addition, were Hero’s theory that the nail nicked the insulation and led to its eventual failure correct, then that nail would have been burned when the wires arced, yet no such nail was ever found. As to the staples, the evidence was that there was ½ inch of rough plywood covered by ¾ inch smooth plywood. Assuming that 2 inch staples were used, they would only have extended ¾ of an inch into the 2x4 cross-braces, and the holes for the wires were shown to be more than an inch from the top edge of the braces. In this view of the evidence, it is inconsequential whether Laborde or Schwehm set the staples because they were too short to damage the wires.
There are, to be sure other views of this same evidence which might have resulted in a finding of negligence as to at least one of the defendants. However, it is not the function of appellate courts to set aside a trial court’s findings of fact absent manifest error. As further stated in Rosell v. ESCO, 549 So.2d 840, 844 (La.1989), ‘Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.” We finally note in this regard that the trial judge’s failure to articulate every factual finding or credibility determination made by him to reach his final result does not constitute error, and no authority is cited by Lafayette for its assertion to the contrary. Moreover, appellate courts are routinely called upon to review jury verdicts for manifest factual error and seldom are any explicit factual or credibility findings available, see Rosell v. ESCO, supra.
Lafayette’s alternative argument here, is also without merit. It proposes that its evidence established that more probably than not at least one of the defendants committed an act of negligence which led to the fire and, if that party cannot be identified, then all three defendants should be cast in solido. We have already shown above that this proposal is not true because there is a permissible view of the evidence in which it is not more probable than not that at least one of them was negligent. We therefore need not resolve here the issue of what result would be obtained were Lafayette’s proposition a correct statement of the case.
The final issue concerns the challenge by Woods to the trial court’s allocation of costs. As a general rule, costs are to be borne by the losing party, although equitable considerations may result in a different allocation of costs, Code Civ.Pro. art. 1920. Appellate courts also give great deference to decisions of trial judges in regard to costs, Pitard v. Davis, 599 So.2d 398 (La.App. 5th Cir.1992). However, there must be at least some colorable equitable factors present in a case before a prevailing party can be east for even partial costs, Welton v. New Orleans Public Service, Inc., 413 So.2d 527 (La.App. 4th Cir.1982). In the present case, we discern no equitable considerations which would justify casting Woods for his own costs, and we therefore set aside that portion of the judgment as to Woods and allocate his costs to Lafayette instead.
For the foregoing reasons, we affirm the judgment of the district court, except as to allocation of costs incurred by Woods, which we hereby allocate to Lafayette. All costs of this appeal are also to be borne by Lafayette.

AMENDED AND AFFIRMED AS AMENDED.